IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

CHANTINE MACKLIN,

      Plaintiff,

v.

CARECORE NATIONAL, LLC d/b/a EVICORE HEALTHCARE d/b/a EVICORE,

      Defendant.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff, Chantine Macklin, by and through undersigned counsel, Stinar & Zendejas, PLLC, brings this action against Defendant CareCore National, LLC d/b/a eviCore Healthcare, d/b/a eviCore as follows:

### I. INTRODUCTION

1.     Plaintiff Chantine Macklin was terminated for what will be shown as pretext.

2.     On April 18, 2019, just after Plaintiff, who successfully worked for Defendant for over six years as a customer care representative, finished a doctor's appointment to treat her serious medical conditions (Multiple Sclerosis and congestive heart failure), Defendant terminated her employment.

3.     At the time of her termination, Defendant *claimed* that Plaintiff's FMLA-related leave from March 6, 2019 through September 5, 2019, had not been approved, and thus her medical related leave on April 18, 2019, was unexcused.  This was false.

4.      In fact, on April 17, 2019, Defendant had approved Plaintiff's now-13[th] request for intermittent FMLA from March 6, 2019 – September 5, 2019.  Per Defendant's own records, as of April 17, 2019, Plaintiff had 192.32 hours of FMLA time remaining.

5.      As such, Defendant's stated reason for termination was pretext for discrimination and retaliation based on her disability and taking FMLA, as well as racial discrimination as Plaintiff was one of the last Black / African-American employees in Defendant's Colorado Springs' office who had not been previously terminated or constructively terminated.

II. JURISDICTION

6.      This action is brought pursuant this Court's federal question jurisdiction, 28 U.S.C. § 1331, to bring claims against Defendant under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* (hereafter "ADA"), the ADA Amendments Act of 2008, Pub.L. No. 110–325 § 2(b)(1), 122 Stat. 3553–3554 (2008) (hereafter "ADAAA"), the Family Medical Leave (hereafter "FMLA"), 29 U.S.C. §§ 2601 *et seq.*, as well as Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000e et seq. ("Title VII").

7.      Plaintiff also invokes this Court's supplemental jurisdiction to bring claims against Defendant under the Colorado Anti-Discrimination Act C.R.S. § 24-34-402 *et seq.* (hereafter "CADA"), which prohibits discrimination, retaliation, and harassment on the basis of disability or perceived disability and race by employers with one or more employees.

8.      Jurisdiction is proper in the U.S. district court for the District of Colorado pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, 42 U.S.C. § 12117, and 29 U.S.C. § 2617(a)(2). The district court has original jurisdiction by virtue of the parties being citizens of different states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interests

and costs.  The district court has original jurisdiction by virtue of the claims arising under the ADA, ADAAA, FMLA, and Title VII claims.  Further, the district court has supplemental jurisdiction over Plaintiffs state law claims pursuant to 28 U.S.C. § 1367.

## III. VENUE

9.       Venue is proper in the district of Colorado pursuant to 28 U.S.C. § 1391(b)(2) as the actions giving rise to this action occurred in the state of Colorado.

## IV. PARTIES

10.      Plaintiff Chantine Macklin ("Plaintiff") is an individual residing in El Paso County, Colorado, who at all relevant times was disabled, perceived to be disabled, availed herself of protections under the FMLA, and Black / African American.  At all relevant times Plaintiff has suffered serious medical conditions, particularly Multiple Sclerosis and congestive heart failure (herein "Serious Medical Conditions").

11.      Defendant CareCore National, LLC d/b/a eviCore Healthcare, d/b/a eviCore (herein "eviCore" or "Defendant") is a New York limited liability company, with its principle office in South Carolina, which at all relevant times operated a call center in Colorado Springs, Colorado.

12.      Upon information and belief, and at all relevant times, Defendant employed more than 50 employees during 20 or more workweeks in the relevant calendar years, including 2019.

## V. EXHAUSTION OF ADMINISTRATIVE REMEDIES

13.      On June 11, 2020, the Colorado Civil Rights Division  ("CCRD") mailed, and Plaintiff subsequently received, a "Notice of Right to Sue" for CCRD Charge No. E2000006847 against Defendant (*see* **Exhibit A**), resulting from a Plaintiff's Charge of Discrimination which

pleaded actual and/or abetting discrimination, retaliation, and harassment on the basis of race, disability and/or medical condition (actual or perceived), engaging in protected activity (e.g. taking FMLA leave), and denial of reasonable accommodation.  This Notice entitles Plaintiff to initiate this action within 90 days of receipt of said notice.

14.     Plaintiff has satisfied all administrative and judicial prerequisites necessary for this action.

## VI. GENERAL ALLEGATIONS

### A. PLAINTIFF BEGINS HER EMPLOYMENT.

15.     Beginning around November 2012 and continuing through April 18, 2019, Plaintiff worked for Defendant in Colorado Springs, Colorado performing her duties as a customer care Representative I in Defendant's call center.

16.     At all times during her employment with Defendant, Plaintiff satisfactorily completed her job duties.

17.     At the time of her termination, Plaintiff earned approximately $1,000 every two weeks, earning $14.54 per hour, plus benefits including PTO, health insurance, dental insurance, vision insurance, Short Term Disability insurance, Long Term Disability insurance, and life insurance, which is approximately valued at 30% of Plaintiff's pay, or $300 every two weeks, bringing Plaintiff's approximate bi-weekly (every two weeks) compensation to $1,300.

18.     At all times, Plaintiff's position did not require Plaintiff to be in the office to perform her primary duties (answering phone calls, customer service via telephone) and she was routinely, and often continuously permitted by Defendant to work remotely for numerous

reasons, and especially to work around treatment and medical appointments relating to Plaintiff's Serious Medical Conditions.

19.     For literally years, Plaintiff applied for and Defendant approved via its 3rd party FMLA administrator, Cigna, intermittent FMLA-leave, consisting of, *inter alia*, time off of work to attend routine doctor appointments and treat her Serious Medical Conditions, as well as receive accommodation and work remotely (which she could easily do given her primary telephonic/internet-based duties).

20.     Over the course of six working years, Plaintiff had applied for and been approved for intermittent FMLA with Defendant thirteen (13) times without issue – until her most recent, pre-termination application beginning in March 2019.

21.     Around February 1, 2019, a new supervisor, Susan Sakoi, was assigned to manage Plaintiff and was at all times Defendant's manager / managing agent.

22.     Between February 2019 and April 18, 2019, during the same time that Plaintiff was attempting to have her most recent FMLA leave request approved, Ms. Sakoi would micro-manage, scrutinize, and harass Plaintiff concerning Plaintiff's work, Plaintiff working remotely, and -most critically here- Plaintiff's absences from work due to doctor's appointments for her Serious Medical Conditions.

23.     At all relevant times during Ms. Sakoi's management of Plaintiff, Ms. Sakoi appeared to target Plaintiff, treating her differently, more negatively, and more critically than other non-disabled, non-Black / African American employees, and employees who were not exercising their FMLA rights.

24.     Between February 2019 and April 18, 2019, during the same time that Plaintiff was attempting to have her most recent FMLA leave request approved, Ms. Sakoi issued no fewer than three (3) write-ups against Ms. Macklin concerning Ms. Macklin's "attendance" – all of which included FMLA approved leaves of absences.

25.     Upon information and belief, Ms. Sakoi did not write up any other of her non-disabled, non-Black / African American, non-FMLA leave utilizing, direct reports in an amount or as frequently as she did Plaintiff in the same timeframe.

26.     Notably as well, both before and after Ms. Sakoi was assigned to manage Plaintiff, the number of Black / African American employees working in the Colorado Springs call center became less and less.

27.     Upon information and belief, over an extended period Defendant terminated or otherwise constructively terminated Black / African American employees in the Colorado Springs call center, shrinking the number of such employees to barely a few at the time Plaintiff was terminated.

28.     Beginning around March 2019, Plaintiff began repeatedly submitting her most-recent request for ongoing/intermittent FMLA-related leave and accommodation from March 6, 2019 through September 5, 2019, to her physicians, and her physician(s) had forwarded the request to Cigna.

     a.   Unlike any other time, Plaintiff's most-recent FMLA-related leave and accommodation request apparently kept either being misplaced or not received by Defendant or Cigna, despite Plaintiff's medical provider sending it multiple times.

b.  Neither Defendant, nor Cigna, took any action to assist or help solve whatever apparent issue was occurring regarding what otherwise had become a routine request, and so it was left on Plaintiff to keep pushing on her medical provider and try to get Defendant and Cigna to take note and approve.

c.  Upon information and belief, there was actually no issue in the completion or delivery of Plaintiff's most recent FMLA-related leave and accommodation request; rather, Defendant, including Cigna, intentionally ignored it and/or refused to acknowledge receipt of it.

29.     On April 18, 2019, Defendant telephoned Plaintiff to terminate her during the workday, just after Plaintiff had finished a doctor's appointment and was, in fact, on an FMLA-approved leave.

30.     According to the Defendant at the time of Plaintiff's termination, and as stated by the Defendant in its response to the CDLE (because Defendant maliciously challenged Plaintiff's unemployment insurance benefits – which delayed Plaintiff's receipt of such benefits for *over 6 months*) , Plaintiff was terminated for "excessive attendance issues not covered by failure to return FML certificate and not reporting absence to leave provider."

31.     Defendant's stated reason for Plaintiff's termination was false and pretextual: Defendant claimed that Plaintiff's FMLA-related leave from March 6, 2019 through September 5, 2019, had not been approved, let alone even received.

32.     In fact, on April 17, 2019, a full day before her termination, Defendant – by and through its agent Cigna – **approved** Plaintiff's ongoing/intermittent FMLA-related leave from

7

March 6, 2019 through September 5, 2019.  *See* **Exhibit B**, a copy of Cigna's approved intermittent FMLA leave from March 6, 2019 through September 5, 2019.

33.     In fact, as Defendant testified during the CDLE hearing, Cigna-related documents are available to Defendant in real-time, same day as, "it's an electronic system … available in the CIGNA portal.  And so we become aware of a denial the day of."

34.     In fact, on April 17, 2019, Plaintiff had 192.32 hours of FMLA time remaining to be used.

35.     As such, despite knowing that: (1) Plaintiff's request for ongoing/intermittent FMLA-related leave from March 6, 2019 through September 5, 2019 had been approved[1]; and (2) Plaintiff had 192.32 hours of FMLA time remaining to be used, Defendant not only wrongfully terminated Plaintiff, but went on to maliciously challenge Plaintiff's unemployment insurance claim under the false pretense of "unexcused absence."

36.     Upon information and belief, Defendant treated non-disabled, non-Black / African American, non-FMLA utilizing employees differently and preferentially better than disabled and/or Black / African American and/or FMLA utilizing employees.

37.     Shortly after Defendant terminated Plaintiff, Plaintiff filed for unemployment insurance, which was challenged by Defendant claiming, "Plaintiff was discharged for excessive attendance issues not covered by failure to return FML certificate and not reporting absence to leave provider."  This was not true.

---

[1] Cigna's knowledge is also imputed onto Defendant, as Cigna was Defendant's hired FMLA administrator

38.     In its response to the CDLE, Defendant stated Plaintiff had unexcused absences the following dates: "3-25-19, 4-10-19, 4-16, 4-17 and 4-19-19" (note, Plaintiff was terminated April 18th, and was not employed April 19th), which were in fact absences covered under intermittent FMLA.

39.     In its response to the CDLE, Defendant answered the question: "Why was the Plaintiff's FML denied?" with "Certification not returned to provider."

40.     In its response to the CDLE, Defendant answered the question: "What certificate was missing or not returned?" with "Medical certification to justify leave was not returned."

41.     In fact, these responses, made weeks after April 18, 2019, were false, and Defendant knew it.  However, Defendant did not stop there.

42.     At the July 17, 2019, CDLE unemployment hearing, Defendant made the following statements:

- "She was discharged for excessive absenteeism."
- "It is not a no-fault attendance policy.  We do consider the reason for the absence and whether or not we are holding the employee accountable for that absence or not."
- "Do you know why the FML was denied?" the Defendant's response was, "Because … the certifications were not returned to our leave administrator."
- CIGNA-related documents are available to Defendant in real-time, same day as, "it's an electronic system … available in the CIGNA portal.  And so we become aware of a denial the day of."
- Plaintiff was not issued a termination letter, as Defendant does not issue termination letters because "We don't issue termination letters…..it's company process, I couldn't tell ya."

43.     Defendant made the above false statements and more, sworn under the penalty of perjury, during the CDLE hearing, despite knowing (and having the paper documentation) that in

9

fact, on April 17, 2019, Plaintiff was **approved** for ongoing/intermittent FMLA-related leave from March 6, 2019 through September 5, 2019.

44.     Defendant did not disclose to either Plaintiff or the CDLE it had records in its possession, specifically **Exhibit B** or **Exhibit C**, which entirely contradicted Defendant's lies.

45.     Because Plaintiff had no access to any of Defendant's records at that time, Plaintiff only was able to provide her testimony to controvert these falsities.  It was only after Plaintiff, via CDLE subpoena to Cigna, was able to receive her FMLA file that irrefutably discredited Defendant and lead to Plaintiff being awarded unemployment insurance.

46.     On September 24, 2019, the undersigned received one-thousand forty-six (1,046) pages of documents responsive to a subpoena seeking FMLA records issued to Cigna by Plaintiff, through the CDLE, to contest her wrongfully challenged unemployment claim.  These documents contain CIGNA SDT 0480 - 0481 (directed to Plaintiff) (**Exhibit B**) and CIGNA SDT 0486 - 0487 (directed to Defendant) (**Exhibit C**), which confirm that as of April 17, 2019, Plaintiff was on approved and protected FMLA Intermittent Leave between March 6, 2019 and September 5, 2019, and had 192.32 hours of FMLA time remaining as of April 17, 2019.

47.     At no time did Defendant ever notify Plaintiff of the FMLA approvals contained in **Exhibit B** or **Exhibit C**.

48.     In addition to her wrongful termination, the fact that Defendant wrongfully challenged Plaintiff's receipt of unemployment benefits, which caused unemployment insurance to be delayed 6 months, caused Plaintiff to suffer additional and wholly avoidable economic and emotional stress and anxiety.

49.      As a consequence of Defendant's above-mentioned actions, Plaintiff has suffered emotional damages.

50.      As a consequence of Defendant's above-mentioned actions, Plaintiff has suffered economic damage as follows: the delayed payment of unemployment insurance; back wages and compensation; loss of economic opportunities and professional growth; loss of insurance and benefits either not available on the open market or otherwise prohibitively expensive; and other forms of economic harm.

51.      As a consequence of Defendant's above-mentioned actions, statutory interest has accrued on the sums of money due to Plaintiff, including back wages and compensation.

52.      As a consequence of Defendant's above-mentioned actions, Plaintiff has been forced to retain counsel and pursue litigation, incurring costs and attorney's fees.

## VII. CLAIMS OF RELIEF

**FIRST CLAIM OF RELIEF**
**Violation of ADA/ADAAA**
**Disability Discrimination, Retaliation, Failure to Accommodate**
**Against Defendant**

53.      Plaintiff incorporates by reference the above-mentioned paragraphs as if fully restated and realleged herein.

54.      At all relevant times, Defendant qualified as Plaintiff's employers and Plaintiff qualified as Defendant's employee under the ADA and the ADAAA.

55.      At all relevant times, upon information and belief Defendant employed over 100 employees.

56.     At all relevant times, Plaintiff satisfactorily performed her job duties for Defendant, could be and often were performed virtually and not in the office, or at varying times throughout the workday or workweek.

57.     At all relevant times, Plaintiff was a qualified individual with a disability and Serious Medical Conditions as she had the requisite skill, experience, education and other job-related requirements of the position and she could perform the essential functions of her position with or without accommodation depending on the particular workday or workweek.

58.     At all relevant times, Defendant regarded and/or perceived Plaintiff as disabled, as well as suffering from Serious Medical Conditions (Multiple Sclerosis and congestive heart failure) that required her to routinely and regularly seek medical treatment during the workday, which constituted an actual or perceived disability or medical condition that substantially limited her in one or more of her major life activities, including, but not limited to eating, sleeping, thinking, concentrating and working.

59.      At all relevant times, and until approximately February 2019, Defendant accommodated Plaintiff's Serious Medical Conditions and associated treatments by *inter alia* allowing Plaintiff to work from home, having a flexible schedule, utilizing leave, or taking other measures to allow Plaintiff to work with reasonable accommodations.

60.     Defendant violated the ADA and the ADAAA when it took actions that were adverse to Plaintiff's employment including, *inter alia,* repeatedly penalized Plaintiff for her medically related and excused leaves and/or, unlawfully terminated Plaintiff's employment and/or failed to accommodate her actual and/or perceived disability by refusing to allow Plaintiff to seek or take leave to treat her actual and/or perceived disability.

61.     As alleged above, Plaintiff's disability and Serious Medical Conditions were the motivating factor for these adverse employment actions taken by Defendant.

62.     As alleged above, non-disabled employees were not subjected to these same adverse employment actions taken by Defendant against Plaintiff.

63.     At all relevant times, as they had for almost six years prior, the accommodations Plaintiff requested were reasonable and posed no undue hardship to Defendant.

64.     Notwithstanding the allegation that Defendant's Manager Susan Sakoi engaged in this discrimination, at all times mentioned herein Defendant's agents, managers, and supervisors knew or should have known of this conduct by witnessing, condoning, or effectuating the discriminating and retaliatory events described herein.

65.     As alleged above, Defendant caused, allowed, and/or condoned Plaintiff to be discriminated against and retaliated against because of Plaintiff's disability and Serious Medical Conditions.

66.     At all relevant times and as alleged above, Defendant acted maliciously and willfully as it knew its conduct was prohibited by the law and/or Defendant showed a reckless disregard for whether its actions were prohibited under the law or not.

67.     As a direct and proximate result of Defendant's unlawful termination and/or failure to accommodate Plaintiff's actual and/or perceived disabilities and/or Serious Medical Conditions, Plaintiff has suffered and will continue to suffer emotional distress as well as economic losses in an amount to be proven at trial.

68.     Defendant further discriminated and retaliated against Plaintiff on account of her actual and/or perceived disabilities and/or Serious Medical Conditions, and further caused

Plaintiff economic and emotional harm, by challenging Plaintiff's unemployment claim based on a reason Defendant knew was not true.

69.     Wherefore, Plaintiff respectfully requests relief as presented at the conclusion of this pleading.

## SECOND CLAIM OF RELIEF
### Violation of Title VII
### Racial Discrimination and Retaliation
### 42 U.S.C. § 2000e-2
### Against Defendant

70.     Plaintiff incorporates by reference the above-mentioned paragraphs as if fully restated and realleged herein.

71.     At all relevant times, Defendant qualified as Plaintiff's employer and Plaintiff qualified as Defendant's employee under Title VII, given that Defendant has 15 or more employees.

72.     Protection against discrimination on the basis of race is provided by Title VII.

73.     As alleged above, Plaintiff is Black / African American, a member of a protected class.

74.     As alleged above, at all relevant times, Plaintiff satisfactorily performed her job duties for Defendant, and had the requisite skill, experience, education, and other job-related requirements of her position.

75.     As alleged above, Defendant caused Plaintiff to suffer adverse employment actions including, *inter alia,* being repeatedly written up on and after February 2019 and/or unlawfully terminated in April 2019.

76.     As alleged above, Plaintiff's race was the motivating factor for these adverse employment actions taken by Defendant.

77.     As alleged above, non-Black / African Americans were not subjected to these same adverse employment actions taken by Defendant against Plaintiff.

78.     As alleged above, Defendant caused Plaintiff to be discriminated against and retaliated against because of Plaintiff's race.

79.     Notwithstanding the allegation that Defendant's Manager Susan Sakoi engaged in this discrimination, at all times mentioned herein Defendant's agents, managers, and supervisors knew or should have known of this conduct by witnessing, condoning, or effectuating the discriminating and retaliatory events described herein.

80.     As alleged above, Defendant caused, allowed, and/or condoned Plaintiff to be discriminated and retaliated against because of her race.

81.     As a direct and proximate result of the conduct of Defendant, Plaintiff's employment was adversely impacted, including terminated, and she suffered economic and emotional damages, including anguish and distress, loss of income, loss of employment-related opportunities such as experience and increased reputation, and other special and general damages, all in an amount to be proven at trial.

82.     At all relevant times and as alleged above, Defendant acted maliciously and willfully as it knew its conduct was prohibited by the law and/or Defendant showed a reckless disregard for whether its actions were prohibited under the law or not.

15

83.     As a direct and proximate result of Defendant's unlawful termination Plaintiff has suffered and will continue to suffer emotional distress as well as economic losses in an amount to be proven at trial.

84.     Defendant further discriminated and retaliated against Plaintiff on account of her race, and further caused Plaintiff economic and emotional harm, by challenging Plaintiff's unemployment claim based on a reason Defendant knew was not true.

85.     Wherefore, Plaintiff respectfully requests relief as presented at the conclusion of this pleading.

## THIRD CLAIM OF RELIEF
### Violation of FMLA
### Discrimination, Retaliation, Interference, Failure to Notify
### 29 U.S.C. §§ 2601 *et seq.*
### Against Defendant

86.     Plaintiff incorporates by reference the above-mentioned paragraphs as if fully restated and realleged herein.

87.     At all relevant times, Defendant qualified as Plaintiff's employer and Plaintiff qualified as Defendant's employee under Title VII, given that Defendant has 50 or more employees.

88.     Plaintiff worked for Defendant for over one year and worked in excess of 1250 hours in the 12 months prior to her need for intermittent FMLA leave.

89.     As alleged, Plaintiff was disabled and suffered from Serious Medical Conditions resulting from her Multiple Sclerosis and congestive heart failure.

16

90.     At all times, Plaintiff's position did not require Plaintiff to be in the office to perform her primary duties (answering phone calls, customer service via telephone) and she was routinely, and often continuously permitted by Defendant to work remotely for numerous reasons, and especially to work around treatment and medical appointments relating to Plaintiff's Serious Medical Conditions.

91.     For literally years, Plaintiff applied for and Defendant approved via its 3rd party FMLA administrator, Cigna, intermittent FMLA-leave, consisting of, *inter alia*, time off of work to attend routine doctor appointments and treat her Serious Medical Conditions, as well as receive accommodation and work remotely (which she could easily do given her primary telephonic/internet-based duties).

92.     Over the course of six working years, Plaintiff had applied for and been approved for intermittent FMLA with Defendant thirteen (13) times without issue – until her most recent, pre-termination application beginning in February 2019.

93.     On and after February 2019, Plaintiff was entitled to FMLA leave for the care and treatment of her own disabilities / Serious Medical Conditions.

94.     Between February 2019 and April 18, 2019, during the same time that Plaintiff was attempting to have her most recent FMLA leave request approved, Ms. Sakoi would micro-manage, scrutinize, and harass Plaintiff concerning Plaintiff's work, Plaintiff working remotely, and -most critically here- Plaintiff's absences from work due to doctor's appointments for her Serious Medical Conditions.

95.     Between February 2019 and April 18, 2019, during the same time that Plaintiff was attempting to have her most recent FMLA leave request approved, Ms. Sakoi issued no less

than three (3) write-ups against Plaintiff concerning Plaintiff's "attendance" – all of which included FMLA approved leaves of absences.

96.     At all relevant times during Ms. Sakoi's management of Plaintiff, Ms. Sakoi appeared to target Plaintiff, treating her differently, more negatively, and more critically than other employees who were not exercising their FMLA rights.

97.     Beginning around March 2019, Plaintiff began repeatedly submitting her most-recent request for ongoing/intermittent FMLA-related leave and accommodation from March 6, 2019 through September 5, 2019, to her physicians, and her physician(s) had forwarded the request to Cigna.

    a.   Unlike any other time, Plaintiff's most-recent FMLA-related leave and accommodation request apparently kept either being misplaced or not received by Defendant or Cigna, despite Plaintiff's medical provider sending it multiple times.

    b.   Neither Defendant, nor Cigna, took any action to assist or help solve whatever apparent issue was occurring regarding what otherwise had become a routine request, and so it was left on Plaintiff to keep pushing on her medical provider and try to get Defendant and Cigna to take note and approve.

    c.   Upon information and belief, there was actually no issue in the completion or delivery of Plaintiff's most recent FMLA-related leave and accommodation request; rather, Defendant, including Cigna, intentionally ignored it and/or refused to acknowledge receipt of it.

18

98.     On April 18, 2019, Defendant telephoned Plaintiff to terminate her during the workday, just after Plaintiff had finished a doctor's appointment and was, in fact, on an FMLA-approved leave.

99.     According to the Defendant at the time of Plaintiff's termination, and as stated by the Defendant in its response to the CDLE (because Defendant maliciously challenged Plaintiff's unemployment insurance benefits – which delayed Plaintiff's receipt of such benefits for *over 6 months*) , Plaintiff was terminated for "excessive attendance issues not covered by failure to return FML certificate and not reporting absence to leave provider."

100.    Defendant's stated reason for Plaintiff's termination was false and pretextual: Defendant claimed that Plaintiff's FMLA-related leave from March 6, 2019 through September 5, 2019, had not been approved, let alone even received.

101.    On April 17, 2019, a full day before her termination, Defendant – by and through its agent Cigna – **approved** Plaintiff's ongoing/intermittent FMLA-related leave from March 6, 2019 through September 5, 2019.  *See* **Exhibit B**, a copy of Cigna's approved intermittent FMLA leave from March 6, 2019 through September 5, 2019.

102.    On April 17, 2019, Plaintiff had 192.32 hours of FMLA time remaining.

103.    At no time did Defendant notify or inform Plaintiff of her approval for ongoing/intermittent FMLA-related leave from March 6, 2019 through September 5, 2019.

104.    Defendant failed to comply with the FMLA Employer Notice Requirements contained in 29 C.F.R. § 825.300 by failing to provide Plaintiff an eligibility notice, a rights and responsibilities notice, and a designation notice, or a notice of approval of ongoing/intermittent FMLA-related leave from March 6, 2019 through September 5, 2019.

105.    29 C.F.R. § 825.300(e) states that a, "Failure to follow the notice requirements set forth in this section may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights."

106.    29 U.S.C. § 2615(a)(1) makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA.

107.    By failing to follow the FMLA Employer Notice Requirements, as well as writing Plaintiff up for her medically related / FMLA-absences, and terminating Plaintiff for applying for, taking, or otherwise availing herself of her FMLA rights, Defendant discriminated, retaliated, interfered with, restrained, or otherwise denied Plaintiff the exercise of her FMLA rights.

108.    Defendant's FMLA discrimination, retaliation, interference and failure to comply with the FMLA Employer Notice Requirements adversely impacted Plaintiff and her employment with Defendant.

109.    Defendant's actions and omissions violated Plaintiff's rights under the FMLA, which require notice and prohibit discrimination, retaliation, and interference.

110.    As alleged above, Defendant caused, allowed, and/or condoned Plaintiff's rights under the FMLA to be violated.

111.    As a direct and proximate result of the conduct of Defendant, Plaintiff's employment was adversely impacted, including terminated, and she suffered economic and emotional damages, including anguish and distress, loss of income, loss of employment-related opportunities such as experience and increased reputation, and other special and general damages, all in an amount to be proven at trial.

112.     At all relevant times and as alleged above, Defendant acted maliciously and willfully as it knew its conduct was prohibited by the law and/or Defendant showed a reckless disregard for whether its actions were prohibited under the law or not.

113.     As a direct and proximate result of Defendant's unlawful termination Plaintiff has suffered and will continue to suffer emotional distress as well as economic losses in an amount to be proven at trial.

114.     Defendant further violated Plaintiff's FMLA rights, and further caused Plaintiff economic and emotional harm, by challenging Plaintiff's unemployment claim based on a reason Defendant knew was not true.

115.     Wherefore, Plaintiff respectfully requests relief as presented at the conclusion of this pleading.

**FOURTH CLAIM OF RELIEF**
**Violation of CADA**
**Disability Discrimination, Retaliation, Failure to Accommodate**
**§§ 24-34-301 to 24-34-804, C.R.S.**
**Against Defendant**

116.     Plaintiff incorporates by reference the above-mentioned paragraphs as if fully restated and realleged herein.

117.     At all relevant times, Defendant qualified as Plaintiff's employers and Plaintiff qualified as Defendant's employee under the CADA.

118.     At all relevant times, upon information and belief Defendant employed over 1 employee.

119.    At all relevant times, Plaintiff satisfactorily performed her job duties for Defendant, could be and often were performed virtually and not in the office, or at varying times throughout the workday or workweek.

120.    At all relevant times, Plaintiff was a qualified individual with a disability and Serious Medical Conditions as she had the requisite skill, experience, education and other job-related requirements of the position and she could perform the essential functions of her position with or without accommodation depending on the particular workday or workweek.

121.    At all relevant times, Defendant regarded and/or perceived Plaintiff as disabled, as well as suffering from Serious Medical Conditions (Multiple Sclerosis and congestive heart failure) that required her to routinely and regularly seek medical treatment during the workday, which constituted an actual or perceived disability or medical condition that substantially limited her in one or more of her major life activities, including, but not limited to eating, sleeping, thinking, concentrating and working.

122.    At all relevant times, and until approximately February 2019, Defendant accommodated Plaintiff's Serious Medical Conditions and associated treatments by *inter alia* allowing Plaintiff to work from home, having a flexible schedule, utilizing leave, or taking other measures to allow Plaintiff to work with reasonable accommodations.

123.    Defendant violated the CADA when it took actions that were adverse to Plaintiff's employment including, *inter alia,* repeatedly penalized Plaintiff for her medically related and excused leaves and/or, unlawfully terminated Plaintiff's employment and/or failed to accommodate her actual and/or perceived disability by refusing to allow Plaintiff to seek or take leave to treat her actual and/or perceived disability.

124.    As alleged above, Plaintiff's disability and Serious Medical Conditions were the motivating factor for these adverse employment actions taken by Defendant.

125.    As alleged above, non-disabled employees were not subjected to these same adverse employment actions taken by Defendant against Plaintiff.

126.    At all relevant times, as they had for almost six years prior, the accommodations Plaintiff requested were reasonable and posed no undue hardship to Defendant.

127.    Notwithstanding the allegation that Defendant's Manager Susan Sakoi engaged in this discrimination, at all times mentioned herein Defendant's agents, managers, and supervisors knew or should have known of this conduct by witnessing, condoning, or effectuating the discriminating and retaliatory events described herein.

128.    As alleged above, Defendant caused, allowed, and/or condoned Plaintiff to be discriminated against and retaliated against because of Plaintiff's disability and Serious Medical Conditions.

129.    At all relevant times and as alleged above, Defendant acted maliciously and willfully as it knew its conduct was prohibited by the law and/or Defendant showed a reckless disregard for whether its actions were prohibited under the law or not.

130.    As a direct and proximate result of Defendant's unlawful termination and/or failure to accommodate Plaintiff's actual and/or perceived disabilities and/or Serious Medical Conditions, Plaintiff has suffered and will continue to suffer emotional distress as well as economic losses in an amount to be proven at trial.

131.    Defendant further discriminated and retaliated against Plaintiff on account of her actual and/or perceived disabilities and/or Serious Medical Conditions, and further caused

Plaintiff economic and emotional harm, by challenging Plaintiff's unemployment claim based on a reason Defendant knew was not true.

132.    Wherefore, Plaintiff respectfully requests relief as presented at the conclusion of this pleading.

**FIFTH CLAIM OF RELIEF**
**Violation of CADA**
**Racial Discrimination and Retaliation**
**§§ 24-34-301 to 24-34-804, C.R.S.**
**Against Defendant**

133.    Plaintiff incorporates by reference the above-mentioned paragraphs as if fully restated and realleged herein.

134.    At all relevant times, Defendant qualified as Plaintiff's employer and Plaintiff qualified as Defendant's employee under CADA, given that Defendant has 1 or more employees.

135.    Protection against discrimination on the basis of race is provided by CADA.

136.    As alleged above, Plaintiff is Black / African American, a member of a protected class.

137.    As alleged above, at all relevant times, Plaintiff satisfactorily performed her job duties for Defendant, and had the requisite skill, experience, education, and other job-related requirements of her position.

138.    As alleged above, Defendant caused Plaintiff to suffer adverse employment actions including, *inter alia,* being repeatedly written up on and after February 2019 and/or unlawfully terminated in April 2019.

139.    As alleged above, Plaintiff's race was the motivating factor for these adverse employment actions taken by Defendant.

140.    As alleged above, non-Black / African Americans were not subjected to these same adverse employment actions taken by Defendant against Plaintiff.

141.    As alleged above, Defendant caused Plaintiff to be discriminated against and retaliated against because of Plaintiff's race.

142.    Notwithstanding the allegation that Defendant's Manager Susan Sakoi engaged in this discrimination, at all times mentioned herein Defendant's agents, managers, and supervisors knew or should have known of this conduct by witnessing, condoning, or effectuating the discriminating and retaliatory events described herein.

143.    As alleged above, Defendant caused, allowed, and/or condoned Plaintiff to be discriminated and retaliated against because of her race.

144.    As a direct and proximate result of the conduct of Defendant, Plaintiff's employment was adversely impacted, including terminated, and she suffered economic and emotional damages, including anguish and distress, loss of income, loss of employment-related opportunities such as experience and increased reputation, and other special and general damages, all in an amount to be proven at trial.

145.    At all relevant times and as alleged above, Defendant acted maliciously and willfully as it knew its conduct was prohibited by the law and/or Defendant showed a reckless disregard for whether its actions were prohibited under the law or not.

146.     As a direct and proximate result of Defendant's unlawful termination Plaintiff has suffered and will continue to suffer emotional distress as well as economic losses in an amount to be proven at trial.

147.     Defendant further discriminated and retaliated against Plaintiff on account of her race, and further caused Plaintiff economic and emotional harm, by challenging Plaintiff's unemployment claim based on a reason Defendant knew was not true.

148.     Wherefore, Plaintiff respectfully requests relief as presented at the conclusion of this pleading.

WHEREFORE, Plaintiff prays for the following relief:

- A.     Orders and judgments as requested;
- B.     Nominal damages;
- C.     Economic and compensatory damages, in an amount to be shown at trial;
- D.     Consequential damages;
- E.     Liquidated damages;
- F.     Punitive or exemplary damages, in an amount to be shown at trial;
- G.     Statutory penalties for failure to pay wages;
- H.     Statutory penalties for a willful failure to pay wages;
- I.     Costs and attorney's fees;
- J.     Pre- and post-judgment interest at the highest rate allowed by law;
- K.     All legal or equitable relief; and
- L.     All other legal or equitable relief to which Plaintiff is entitled and/or the court and/or jury deems just and proper.

**PLAINTIFF REQUESTS A TRIAL BY JURY ON ALL ISSUES TRIABLE TO A JURY.**

Respectfully submitted this 22nd day of July 2020.

_s/Christopher G. Wilhelmi_
Christopher G. Wilhelmi
Attorney for Plaintiff
Stinar & Zendejas, PLLC
121 East Vermijo Ave, Suite 200
Colorado Springs, CO 80903

E-mail: chris@coloradolawgroup.com
Phone: 719-635-4200
Fax: 719-635-2493